IN THE COMMONWEALTH COURT OF PENNSYLVANIA

A. P.,                                  :
                    Petitioner          :
                                        :   **CASE SEALED**
            v.                          :   No. 1929 C.D. 2016
                                        :   Submitted: June 2, 2017
Department of Human Services,           :
                    Respondent          :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE JOSEPH M. COSGROVE, Judge[1]

OPINION NOT REPORTED

MEMORANDUM OPINION
BY PRESIDENT JUDGE LEAVITT                          FILED: January 5, 2018

        A.P., *pro se*, petitions for review of an adjudication of the Department

of Human Services (Department) denying his request to expunge an indicated report

of child abuse from the ChildLine Registry.[2]  The Department's Bureau of Hearings

and Appeals adopted, in its entirety, the recommended adjudication of the

Administrative Law Judge (ALJ), which was issued following a second remand from

this Court. The ALJ found that the County Children and Youth Services agency

(CYS) established that A.P. (Uncle) had sexually abused his nephew, V.P. (Child),

---

[1] This case was decided before Judge Cosgrove's service on the Court ended on December 31, 2017.

[2] ChildLine is a unit of the Department that operates a statewide toll free system for receiving and maintaining reports of suspected child abuse, along with making referrals for investigation.  55 Pa. Code §3490.4.  The ChildLine Registry is maintained in accordance with the Child Protective Services Law, 23 Pa. C.S. §§6301-6386.

in 2006, when Child was 13 years old.[3]  Uncle argues that the ALJ erred and abused his discretion in concluding that Child's testimony outweighed the evidence that contradicted Child's accusation.  We agree.

## Background

We begin with a summary of the case, which is more fully recited in our two prior opinions: *A.P. v. Department of Public Welfare*, 98 A.3d 736 (Pa. Cmwlth. 2014) (*A.P. I*) and *A.N.P. v. Department of Human Services* (Pa. Cmwlth., No. 567 C.D. 2015, filed February 10, 2016) (*A.P. II*).[4]

In 2010, Child accused Uncle of sexually abusing him five years earlier, during a time when Uncle was temporarily residing in Child's home during Uncle's separation from his wife.  Uncle lived with Child's family from September 2005 to August 2006.  On June 15, 2010, CYS filed an indicated report naming Uncle as a perpetrator pursuant to Section 6338(a) of the Child Protective Services Law.[5]  Uncle

---

[3] On August 22, 2017, this Court issued a rule upon Uncle to show cause why his petition for review is not moot pursuant to Section 6338(b) of the Child Protective Services Law, 23 Pa. C.S. §6338(b) (requiring expungement of  information when the subject child attains 23 years of age). Uncle responded that Section 6338(c) of the Child Protective Services Law states that the ChildLine Registry "shall indefinitely retain the names of perpetrators of child abuse … who are subjects of founded or indicated reports only if the individual's Social Security number or date of birth is known to the department." 23 Pa. C.S. §6338(c).  In its response to the rule to show cause, the Department confirmed that it has Uncle's birthdate, which is on the indicated report, and it will indefinitely retain his name on the ChildLine Registry.  The matter is not moot.

[4] In November 2014, the Department of Public Welfare was renamed the Department of Human Services.  *See* Act of September 24, 2014, P.L. 2458, *as amended*, 62 P.S. §103 (effective November 24, 2014).

[5] Section 6338(a) states in relevant part:

> When a report of suspected child abuse ... is determined by the appropriate county agency to be ... an indicated report, the information concerning that report of suspected child abuse ... shall be made in the Statewide central register. Notice of the determination must be given to the subjects of the report, other than the abused

requested expungement of the indicated report, and the ALJ conducted two days of hearings.

Child testified that one night, in the basement recreation room while watching a DVD entitled "When a Stranger Calls"[6] after drinking spiked lemonade, Uncle touched Child's "crotchal area" and then masturbated in view of Child. Notes of Testimony (N.T.), 3/7/2013, at 33. Child "guessed" that this incident was followed by others but could not name the year, month, day, what he was wearing or what movies were playing. *Id.* at 38. Child described the subsequent incidents as involving either Child or Uncle engaging in masturbation while watching a movie. Child did not "remember" if oral sex occurred. *Id*. at 40.

On cross-examination about the first incident, Child did not know if it took place before or after Christmas. Child could not remember whether he was wearing sweatpants, pajamas, a t-shirt or sweatshirt. Child did not see Uncle's penis; however, he observed Uncle's act of masturbation from the corner of his eye. Child did not know if he experienced an orgasm. Child acknowledged that his testimony before the ALJ was different from his statements to police and to his juvenile

---

child, and to the parent or guardian of the affected child or student along with an explanation of the implications of the determination. Notice given to perpetrators of child abuse and to school employees who are subjects of indicated reports for school employees or founded reports for school employees shall include notice that their ability to obtain employment in a child-care facility or program or a public or private school may be adversely affected by entry of the report in the Statewide central register. The notice shall also inform the recipient of his right, within 45 days after being notified of the status of the report, to appeal an indicated report, and his right to a hearing if the request is denied.

23 Pa. C.S. §6338(a) (amended by the Acts of December 18, 2013, P.L. 1170; April 7, 2014, P.L. 388; and December 31, 2014, P.L. 653, effective December 31, 2014).

[6] This was the only movie Child could recall; it was released on DVD on May 16, 2006.

probation officers with respect to the number of incidents and the period of time during which they took place.

Father testified. He stated that Child would let Uncle in the house if it were late and Father was in bed. Father acknowledged that at first he did not believe Child's accusation of Uncle, who is Father's brother, but he changed his mind. He now believed Child's accusation.

Uncle presented the testimony of his girlfriend (Girlfriend), who testified that when Uncle's wife discovered their relationship, the two separated, and Uncle began spending most nights at Girlfriend's house. In January 2006, Uncle obtained weekend custody of his son and stayed at Father's house during those visits. Girlfriend acknowledged that Uncle did not move his personal effects to her house; he brought clothes in an overnight bag. Girlfriend's relationship with Uncle ended when he reunited with his wife. At the time of the hearing, Girlfriend and Uncle had not dated in six years.

Uncle presented evidence relevant to his reputation and character and to that of Child. Child's paternal grandmother (Grandmother) testified that Child had a reputation for being "absolutely not truthful. Never truthful." N.T., 3/7/2013, at 133. Grandmother, the mother of both Uncle and Father, testified that Uncle was "[v]ery moral" in character. *Id.* at 138. Uncle's two brothers (Uncle I and Uncle II) testified. Uncle I testified that Uncle had a reputation for being truthful and having "[g]reat moral character." *Id.* at 146. He also testified that Child had a reputation of lying to save his own hide. *Id.* at 147. Uncle II testified that everyone loved Uncle, that he enjoyed a reputation for truthfulness and has a high moral character. *Id.* at 150.

4

Uncle presented testimony from a police officer who investigated Child's accusation. He stated that criminal charges were not lodged against Uncle because the accusation lacked any corroboration.

The daughter of Uncle I, Child's cousin (Cousin), testified. She explained that she and Child were close growing up because they were the same age. She testified that in the summer of 2010, she drove Child to a meeting with his probation officer while Child's parents were overseas. Cousin asked Child about his accusation of Uncle and found Child's response strange because he did not defend his accusation as true, which she expected.

Uncle testified that in 2005, he began doing audit work for a company that involved extensive out-of-town travel. He stated that he spent most nights at Girlfriend's home because it was closer to his office. Uncle testified that other than the weekends with his six-year-old son, he stayed at Father's home only a few nights a month. He presented a personal paper calendar from that period, which documented his out-of-town travel and visits with his children.

Uncle denied that he had ever watched a movie alone with Child, in any room, or that he ever gave him alcohol. He described learning of Child's accusation during a phone call from his brother while he was on a business trip to Chicago:

> He said, "you know, [Child's] in [name of drug treatment facility]." And he said -- told me what [Child] had said. "[Child] said that you touched him and you masturbated in front of him.["] And, you know, I was shocked. I was repulsed by it.
>
> And, you know, I said, "[Father's name] I never did any of those things."
>
> And he said back to me, he said, "I know. [Child] is a bit -- a habitual liar." He said, "He engages in different types of lying. I believe you 98 percent, but because he's my son," he's saying, "yet I got to believe him 2 percent."

N.T., 4/11/2013, at 44-45. Uncle categorically denied Child's accusation. He testified that Child never unlocked the door for him. The only times he was ever alone with Child were the two or three times he drove Child to school. He was never alone with child in the house.

On rebuttal, CYS called Father and Mother to testify. Father acknowledged that Uncle travelled for his job but testified that Uncle slept at his house "most nights." *Id.* at 79. He testified that Child let Uncle in the house after he and Mother went to bed and that Uncle took Child to school on more than two or three occasions. Mother also testified that from September 2005 through September 2006 Uncle spent "most nights" at their home. She conceded that Uncle may have also stayed at Girlfriend's house during this period. She also testified that Uncle took Child to school in the morning "fairly regularly." *Id.* at 94. Father did not know how many times Uncle took Child to school, but did state that Mother normally took Child to school on her way to work. *Id.* at 80.

The ALJ found Child's testimony so credible that it met the clear and convincing standard of proof.[7] Specifically, the ALJ found that the facts to which Child testified "are remembered distinctly, and that [his] testimony is so clear…and convincing" that the ALJ was able "to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Suber v. Pennsylvania Commission on Crime and Delinquency*, 885 A.2d 678, 682 (Pa. Cmwlth. 2005). The ALJ found that the sexual abuse began in May of 2006 and ended several months later when Uncle moved out. The ALJ rejected Uncle's calendar as having no probative value because it could have been altered. The ALJ found Father and Mother credible. He

---

[7] The ALJ employed the clear and convincing standard that was later rejected by our Supreme Court in *G.V. v. Department of Public Welfare*, 91 A.3d 667 (Pa. 2014). In *G.V.*, the Supreme Court held that the proper standard of proof is the substantial evidence standard. *Id.* at 674.

found Uncle not credible, noting, *inter alia*, that Uncle had engaged in an extra-marital affair. The ALJ found Uncle's reputation and character witnesses not reliable because they were family members. The ALJ found Uncle to be a perpetrator of abuse, and the Department's Bureau of Hearings and Appeals adopted the ALJ's recommended adjudication.

## First Appeal

On appeal, Uncle argued that CYS's evidence did not meet the clear and convincing standard of proof; his evidence outweighed Child's uncorroborated and vague testimony; and the Department erred by arbitrarily and capriciously disregarding his evidence. We concluded that the ALJ did not address the evidence that contradicted Child's testimony, which is required under the statutory standard for a fair hearing, and the ALJ did not explain his credibility determinations. We further concluded that the ALJ capriciously disregarded Cousin's testimony and employed an impermissible double standard in evaluating the evidence.[8]

Because the ALJ's stated rationale for his findings did not withstand close scrutiny, we vacated and remanded with instructions for the ALJ to

> undertake this weighing of the evidence with reference to demeanor and substance of the testimony and all other evidence

---

[8] For example, the ALJ rejected Uncle's character witnesses because of a perceived familial bias but did not invoke the concept of familial bias against Father and Mother; (2) the ALJ rejected Girlfriend's testimony as biased even though Girlfriend and Uncle had not dated for six years; (3) the ALJ criticized Uncle for not calling Child's teachers or friends to testify about Child's reputation but did not observe that neither Father nor Mother testified that Child was truthful; (5) the ALJ excused Child's false statements to police about the abuse as lapses in memory due to the passage of time but did not so excuse Uncle's statement about the number of times he drove child to school, which conflicted with the recollection of Child's Parents; and (6) the ALJ found that Child was credible because he risked alienation from family members by making an accusation against Uncle but did not consider that Child might experience alienation from Mother and Father were he to recant that accusation.

to enable meaningful appellate review. A dismissal of one side's evidence with a conclusory credibility determination does not suffice.

*A.P. I.*, 98 A.3d at 745.

## First Remand Adjudication

On remand, the ALJ again credited Child's "clear, credible" statements that Uncle had sexually abused him by summarily concluding that Child's "testimony is of the quality that it outweighs inconsistent evidence." ALJ Recommended Adjudication, 12/15/2014, at 11, 15. The Department adopted the ALJ's recommended adjudication, and Uncle again petitioned for this Court's review.

## Second Appeal

On appeal, Uncle argued that no reasonable person would accept Child's vague accusation, full of inconsistencies, as outweighing the evidence he presented in opposition. Uncle argued that the ALJ capriciously disregarded Cousin's testimony despite this Court's specific instruction to make findings thereon. Finally, Uncle asserted that the ALJ employed an impermissible double standard in evaluating the evidence. We agreed and vacated the Department's order and remanded for further findings and conclusions. *A.P. II*, (Pa. Cmwlth., No. 567 C.D. 2015, filed February 10, 2016).[9]

---

[9] We cited a number of deficiencies in the ALJ's analysis, most of which were the same as in *A.P. I. See* n.8, *supra.*

8

We did so because the ALJ again ignored Cousin's testimony and glossed over deficiencies in Child's testimony.[10]    Because there was no corroborative evidence, physical or otherwise, Child's testimony had to "be of such a quality" to allow the factfinder to conclude that it outweighed inconsistent evidence. *In re: S.H.*, 96 A.3d at 462.  We held that the ALJ had to consider all of Child's testimony, not just the selective parts that recited abuse, and explain his rationale for his credibility decision.  We again cautioned the ALJ not to apply a double standard for evaluating the evidence presented by CYS and by Uncle.

## Second Remand Adjudication

On remand, the ALJ again held that Uncle was a perpetrator of abuse. The ALJ found Child's testimony credible and Uncle's testimony not credible on the basis of demeanor.  On October 31, 2016, the Department's Bureau of Hearings and Appeals adopted the ALJ's recommendation.  Uncle petitioned for this Court's review.[11]

## Present Appeal

---

[10] Child's account of the number of incidents of abuse varied.  For example, Child told police there were 30 to 40 incidents over six or seven months and testified before the ALJ that the incidents averaged one every other week.  The ALJ acknowledged that there could not have been 30 to 40 incidents between May and August but concluded there could have been 10 to 20.  The ALJ excused the discrepancy between 10 to 20 and 30 to 40 as "not glaring, but minor," and attributable to the effect of the passage of time on Child's memory.  ALJ Recommended Adjudication, 12/15/2014, at 14.  An average of one incident every other week for the three-month period would equal seven or eight incidents, not 10 to 20 and certainly not 30 to 40.  The ALJ did not address these discrepancies.

[11] Our review determines whether constitutional rights were violated, whether errors of law were committed or whether necessary findings of fact are supported by substantial evidence.  *J.M. v. Department of Public Welfare*, 94 A.3d 1095, 1098 n.8 (Pa. Cmwlth. 2014).

9

On appeal, Uncle raises three issues. First, he argues that the evidence in this case weighed so heavily in his favor that the ALJ's finding of abuse does not satisfy the statutory standard of substantial evidence. Second, he contends that the ALJ arbitrarily and capriciously disregarded the competent evidence that supported Uncle's denial. Third, he asserts that the ALJ's refusal to expunge the indicated report was arbitrary and capricious.[12] Thus, Uncle contends that the Department erred and abused its discretion in adopting the ALJ's recommended report.

**Analysis**

In an expungement hearing, the county agency bears the burden of proving that the perpetrator committed child abuse within the meaning of the statute. *B.J.K. v. Department of Public Welfare*, 773 A.2d 1271, 1275 (Pa. Cmwlth. 2001). Section 6303(a) of the Child Protective Services Law defines "substantial evidence" as

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

23 Pa. C.S. §6303(a). To meet this statutory burden of proof, the county must submit evidence of abuse that a reasonable person will find to outweigh contrary evidence. *A.P. I.*, 98 A.3d at 742-43. Whether evidence meets a prescribed standard of proof is "always a question of law and therefore reviewable by the appellate court." *Stafford v. Reed*, 70 A.2d 345, 346 (Pa. 1950). To meet the statutory standard, the child's "testimony must be of such a quality to allow the factfinder to conclude that it outweighs 'inconsistent evidence.'" *In re: S.H.*, 96 A.3d 448, 462 (Pa. Cmwlth.

---

[12] For purposes of this appeal, we treat Uncle's second and third issues together as one issue.

10

2014) (holding that where there is no physical evidence of abuse all of the child's testimony must be considered, not just selective parts).

Where "a witness actually testifies before an ALJ, the judge may base his credibility determinations on the demeanor of the witness." *R.J.W. v. Department of Human Services*, 139 A.3d 270, 287 (Pa. Cmwlth. 2016). The Pennsylvania Supreme Court has further explained:

> In such an instance, there often is not much to say, nor is there a need to say much, in order for a reviewing body to determine that the decision was reasoned. Such a credibility determination may involve nothing more than the fact-finder's on-the-spot, and oftentimes instinctive, determination that one witness is more credible than another. The basis for the conclusion that certain testimony has the "ring of truth," while other testimony does not, may be difficult or impossible to articulate-but that does not make such judgments invalid or unworthy of deference.

*Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043, 1053 (Pa. 2003).

Uncle asserts that Child's testimony was not of such a quality that it could reasonably be found to outweigh Uncle's testimony, which was corroborated by both documentary and testimonial evidence. Four members of Child's family testified that Child had a reputation for lying and developed his habit for lying in childhood. Uncle, by contrast, was reported to enjoy a reputation for a high moral character. Neither Father nor Mother rebutted this testimony. To the contrary, Father admitted to Uncle that Child engaged in "different types of lying" and was an "habitual liar." N.T., 4/11/2013, at 44-45. Uncle also impeached Child's testimony by pointing out the prior inconsistent statements Child had made about the purported abuse.

11

Uncle also points out that the ALJ found that the first incident of abuse took place on the date of the DVD release, *i.e.*, May 16, 2016. This means that the alleged abuse took place during a period when Uncle was traveling and spending most weeknights with Girlfriend. These facts were corroborated by documentary evidence, *i.e.*, Uncle's paper calendar, and by Girlfriend's sworn testimony. Uncle's account was not refuted by CYS.

By contrast, Child's testimony lacked any detail or specifics on the time and place of the masturbation incidents. His testimony was at odds with his prior statements to law enforcement authorities. To them, Child reported that the abuse happened when he was 11 or 12 (when he was actually 13) and was repeated 30 to 40 times. In his testimony to the ALJ, Child gave different estimates or "guesses" about the frequency of the incidents and stated that he "did not know" how many times it happened. N.T., 3/7/2013, at 38. Child never confided to a friend, "his close cousin," a teacher or his brother about the abuse. N.T., 3/7/2013, at 41.[13] Child's version of the events lacked any corroboration.

The Department counters that it is the job of the factfinder to weigh and credit the evidence, and the ALJ did not err or abuse his discretion in discharging his role as factfinder.

The ALJ emphasized Child's demeanor, which he found to have the ring of truth. The ALJ reasoned that it was Uncle's burden to impeach Child's

---

[13] The ALJ was untroubled by the absence of corroboration of Child's accusation, such as contemporaneous statements by Child about the alleged abuse. He explained, "[u]nfortunately, it is all too common for a child not to immediately report it to anyone when they [sic] are sexually abused. They may be experiencing fear, mistrust, guilt, etc." Recommended Adjudication, 7/7/2016, at 17. There is zero evidence in the record to support the ALJ's factual finding about what is "common" among sexually abused children. This is demonstrable error.

testimony by establishing Child's reputation for lying.[14] The ALJ rejected the testimony of Uncle's witnesses regarding Child's reputation because they did not include persons outside the family.[15] We reject the ALJ's reasoning in this regard.

First, for Uncle to go outside the family for any character and reputation witnesses would require Uncle to damage his reputation. This would defeat the entire purpose of an expungement appeal.

Second, there is no authority for the ALJ's view that Uncle had to prove Child's reputation for lying with testimony from Child's "friends, teachers [or] classmates." Recommended Adjudication, 11/7/2016, at 18. Child's propensity for lying could be proved by testimony from Uncle I, Uncle II, Cousin and Grandmother. Each was in a position to know Child's tendency to lie and each chose to offer sworn testimony to that point. They did so with the knowledge that their testimony could only alienate their equally consanguineous family member, *i.e.*, Child's Father. Even the ALJ conceded that family members are in the best position to know a person's character. ALJ Recommended Adjudication, 11/7/2016, at 18.

Third, the ALJ dismissed the impeachment testimony by stating, first, that "there was no testimony from either of the subject child's parents or brother that [Child] had a reputation for lying." *Id*. That Child's Parents did not confirm Uncle's impeachment evidence is to be expected. Far more relevant is that neither Child's

---

[14] Pennsylvania Rule of Evidence 608(a) provides:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked. Opinion testimony about the witness's character for truthfulness or untruthfulness is not admissible.

PA. R.E. 608(a).

[15] Notably, the ALJ did not make any credibility determinations with respect to Uncle I, Uncle II, Grandmother or Cousin. Recommended Adjudication, 11/7/2016, at 6.

Parents nor his brother (who did not testify at all) refuted the testimony of Uncle I, Uncle II, Grandmother or Cousin. Indeed, Father admitted to Uncle that Child had a habit of lying. The rebuttal testimony of Father and Mother concerned only how often Uncle drove Child to school.

In the end, the ALJ found Child's history of, and reputation for, lying irrelevant. The ALJ reasoned that "just because someone has a reputation for lying, does not automatically mean that everything they say is a lie …. [E]ven if I accept it as true that the subject child has a reputation for lying, I do not believe he was lying regarding these particular instances …." *Id.* This easy dismissal was made in the face of the numerous problems with Child's testimony, which was vague, contradicted by prior inconsistent statements and marked by "guesses," "I don't remembers" or "I don't know." *See, e.g.*, N.T., 3/7/2013, at 38. Further, Child's testimony lacked any corroboration from any other person because he did not tell any person about the alleged abuse for over five years. *Id*. at 41. In these ways, the ALJ erred and abused his discretion.[16]

The ALJ found that the abuse took place between May 16, 2006, the day the movie "When a Stranger Calls" was released on DVD, and August 12, 2006, when Uncle moved out.[17] The ALJ acknowledged that this timetable made Child's statement to police that the abuse occurred 30 to 40 times over a period of seven months impossible and, therefore, false. Again, however, the ALJ reasoned that

---

[16] Where, as here, there is no physical evidence of abuse or any witnesses to the abuse, it is only the statement of the child victim that forms the basis for the indicated report. This leaves the perpetrator with the burden to prove a negative, *i.e.*, that the abuse did not happen. Where the accusation is stale by the passage of five years and does not specify a date and time, the perpetrator cannot proffer an alibi defense. All he can do is attempt to bolster his denial with reputation evidence on his behalf and to impeach the testimony of the accusing child.

[17] By the ALJ's logic, Uncle purchased the DVD on the day of its release and that very night popped it into the family's video equipment for viewing with Child.

14

Child's false statements to police did not affect the truthfulness of his testimony to the ALJ. All discrepancies in Child's testimony were explained, and excused, by the passage of time between the incident of abuse and the hearing thereon. By contrast, the ALJ gave no such leniency to Uncle. The ALJ found, as fact, that Uncle drove Child to school multiple times and, thus, Uncle's testimony that he drove child two or three times was intentionally false and not explained by an inability to remember events that took place years earlier.

The ALJ started with the premise that Child's demeanor showed truthfulness and Uncle's demeanor did not. From that point, the ALJ evaluated all other evidence to match this initial premise. For example, the ALJ credited Mother's estimate that Uncle took Child to school "a couple times a week" even though it was not supported by Father. The ALJ then found Uncle's different recollection a knowing lie. N.T., 4/11/2013, at 94. In actuality, the number of times Uncle drove Child to school is far afield from the central issue in this case.

Due process requires a fair hearing before a neutral factfinder. The neutrality of the factfinder may be questioned here because the ALJ found in his first recommended adjudication that Child's testimony satisfied the clear and convincing standard of proof. Under this standard, the testimony of the witness must be so clear and distinct that the factfinder can "come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Commonwealth v. Lee*, 935 A.3d 865, 883 (Pa. 2007) (quoting *Commonwealth v. Maldonado*, 838 A.2d 710, 715 (Pa. 2003)). Child's testimony does not meet the clear and convincing standard of proof. To the contrary, Child's testimony is so vague, it reads like the testimony of one hoping to be discredited. Child could not say what he was wearing during the first incident; the month or year it occurred; or even whether he had an orgasm. The facts reported

15

by Child were not "remembered distinctly," and his testimony lacked the precision that would allow the factfinder to come to a conviction "without hesitancy." *Suber*, 885 A.2d at 682. Whether testimony meets the requisite standard of proof is a legal question that can be reviewed on appeal. *Stafford*, 70 A.2d at 346. Likewise, whether Child's testimony is of a quality that it outweighs Uncle's contrary evidence presents a legal question that can be reviewed on appeal. We conclude that the ALJ erred and abused his discretion in applying the substantial evidence standard set forth in Section 6303(a) of the Child Protective Services Law.

"Determinations as to credibility and evidentiary weight will not be disturbed on appeal absent an abuse of discretion." *F.V.C. v. Department of Public Welfare*, 987 A.2d 223, 228 (Pa. Cmwlth. 2010). As this Court has explained:

> An abuse of discretion "occurs not merely when the [lower tribunal] reaches a decision contrary to the decision that the appellate court would have reached. Rather, *an abuse of discretion occurs* 'when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or *where the record shows that the action is a result of partiality, prejudice, bias or ill will*.'"

*Id*. (quoting *Payne v. Workers' Compensation Appeal Board (Elewyn, Inc.)*, 928 A.2d 377, 379 (Pa. Cmwlth. 2007) (emphasis added)). The ALJ's judgment is manifestly unreasonable and demonstrated bias.

First, the ALJ held in the first recommended adjudication that Child's accusations satisfied the clear and convincing standard of proof and never moved off that position. Plainly, for the reasons set forth above, Child's testimony was neither clear nor convincing. Nevertheless, upon remand, the ALJ stuck to his original legally erroneous conclusion and gave, at best, token consideration of the remand directive.

16

Second, the ALJ applied a different standard to the evidence, depending on the party proffering it. All of Uncle's witnesses were disbelieved or their testimony was given no weight because they were his family members or "cared" for Uncle, as in the case of Girlfriend. Father and Mother were believed even though they were Child's family members and presumably cared for Child. Child's prior inconsistent statements on material facts made to law enforcement authorities were excused by the passage of time. Discrepancies between Uncle's memory of the number of times he drove Child to school and Father's and Mother's memory were not excused by the passage of time. Rather, the ALJ decided that discrepancy showed that Uncle was a liar.

Third, the ALJ decided the case was solely a matter of demeanor evaluation. The statute, however, requires more. It requires the weighing dynamic set forth in 23 Pa. C.S. §6303(a), which means that the evidence that conflicts with the accusation must be considered. The factfinder must explain why a reasonable person would agree that Child's testimony outweighed all conflicting evidence. The ALJ largely disregarded this responsibility by assigning zero weight to all the testimony and documentary evidence presented by Uncle.

Here, every credibility determination and every weighing of the evidence by the ALJ favored CYS and damned Uncle. These uniform rulings do not in themselves require disqualification. *Subaru,* 842 A.2d at 1009. However, the ALJ's uniform rulings, critique of this Court's remand, and clear error in finding that Child's testimony satisfied the clear and convincing standard of proof show bias. The ALJ immediately decided that Child was truthful and that Uncle was a perpetrator and then evaluated all other evidence to fit his conclusion that Uncle was a perpetrator.

17

Error or abuse of discretion by an ALJ will support a reversal of an adjudication. *See, e.g.*, *J.C. v. Department of Human Services*, (Pa. Cmwlth., No. 1867 C.D. 2016, filed October 19, 2017). Here, the ALJ made up his mind based solely on his assessment of the demeanor of the witnesses. The Child Protective Services Law requires more. It requires substantial evidence of abuse, which means that the evidence of abuse must be of a quality that it outweighs any conflicting evidence. 23 Pa. C.S. §6303(a). Whether the record satisfies the statutory standard is a question of law subject to appellate review. In this respect, it is no different than the review of a record to determine whether the evidence satisfies the clear and convincing standard of proof. *See Stafford,* 70 A.2d at 346. We hold that the ALJ erred and abused his discretion in holding that Child's testimony was of a quality that it rendered all of Uncle's rebuttal evidence meaningless. Accordingly, we will reverse the Department's adoption of the ALJ's recommendation.

## Conclusion

For the above reasons, we reverse the adjudication of the Department of Human Services.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

A. P.,                                    :
                    Petitioner           :
                                         :
          v.                             :   No. 1929 C.D. 2016
                                         :
Department of Human Services,            :
                    Respondent           :

**O R D E R**


          AND NOW, this 5th day of January, 2018, the order of the Department of Human Services, Bureau of Hearings and Appeals, dated October 31, 2016, is hereby REVERSED.

                         _____
                         MARY HANNAH LEAVITT, President Judge