2018 PA Super 84

| | |
|---|---|
| IN RE: PETITION OF SANDRA NAVARRA BY THE LIMITED GUARDIAN OF HER ESTATE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: CHRIS NAVARRA, LINDA D'AUGOSTINE, JOANNE M. NAVARRA, RICHARD E. NAVARRA AND CHARLENE A. SHELLEDY | No. 1307 WDA 2016 |

Appeal from the Order entered August 25, 2016
In the Court of Common Pleas of Lawrence County
Orphans' Court at No: 109 of 2014 O.C.

BEFORE:  STABILE, J., FORD ELLIOTT, P.J.E., and STRASSBURGER, J.*

OPINION BY STABILE, J.:                              **FILED APRIL 11, 2018**

This is an appeal from the August 25, 2016 order in the Court of Common Pleas of Lawrence County, Orphans' Court Division, granting the petition of Chrystie Clarke, limited guardian of Sandra Navarra, to substitute the judgment of the Orphans' Court for Navarra pursuant to 20 Pa.C.S.A. § 5536(b) and disinherit five residuary legatees to Navarra's will.  The Orphans' Court lacked jurisdiction to decide the rights of one of the five legatees, Charlene Shelledy, because Shelledy died during Orphans' Court proceedings, and the personal representative of Shelledy's estate has not been substituted in her place.  Accordingly, we vacate the Orphans' Court's

_____

* Retired Senior Judge assigned to the Superior Court.

order as to Shelledy. At the same time, however, we have jurisdiction to decide the appeal of the four remaining legatees, and we affirm the Orphans' Court's decision to substitute its judgment and disinherit these legatees.

## Background

The Orphans' Court's August 25, 2016 opinion accurately recounts the evidence of record as follows. Fred Navarra ("Husband") and Sandra Navarra ("Wife") married in 1983. Both spouses had children from previous marriages. For the next 26 years, Husband and Wife lived together at their residence in New Wilmington, Pennsylvania. On January 23, 2007, Husband suffered serious injuries in an automobile accident that required hospitalization for two months and round-the-clock assistance when he returned home.

On May 14, 2007, Husband and Wife executed mutually reciprocal wills. The residuary clause in each will provided that (1) seventy percent of the residuary estate would pass to Husband's legatees,[1] and (2) thirty percent of the residuary estate would pass to Wife's children, Clarke and Brent Young.

Husband and Wife continued to reside together, but at some point after execution of the reciprocal wills, Wife began to show signs of dementia due to age and alcohol abuse. Friction began to develop between Wife's children and Husband's legatees. Linda D'Augostine ordered Husband's caregivers to keep

---

[1] For purposes of this opinion, Husband's legatees include his four children, Richard E. Navarra, Linda D'Augostine, Charlene A. Shelledy, Joanne M. Navarra, and Richard's ex-wife, Chris Navarra.

Husband and Wife separated from one another and attempted to remove Wife from the residence. Husband's children repeatedly cancelled caregiver appointments for Wife at the home and left her at home alone despite her need for continuous care.

On November 9, 2009, Clarke moved Wife from the marital residence to a nursing home[2] because Clarke suspected that Husband's daughter, D'Augostine, was treating Wife abusively. One day later, Husband's legatees changed the locks to the marital residence and denied Clarke access to assets that Wife shared jointly with Husband. Subsequently, the Orphans' Court appointed Clarke as plenary guardian of Wife's person.

On December 31, 2009, Husband executed a revised will disinheriting Wife and Wife's children and leaving his entire residuary estate to his children. Further, in September 2010, certificates of deposit jointly owned by Husband and Wife were cashed, and the proceeds were used to purchase annuities for which Husband's children were the only beneficiaries, excluding Wife and her children. Husband's children also removed Wife as a recipient of Husband's IRA account at brokerage firm Janney Montgomery Scott, LLC, and listed themselves as recipients. One of Husband's children, Richard Navarra, depleted a bank account that was in Husband's and Wife's joint names.

_____

[2] Wife never returned to the marital residence. She continues to live in the nursing home, suffering from dementia.

- 3 -

On July 24, 2012, Husband died. Following his death, Clarke filed a declaratory judgment action requesting that the court name Wife as the sole owner of the proceeds of a stock purchase agreement entered into between Husband's and Wife's agents in 2007. Richard Navarra opposed Clarke's petition in his capacity as personal representative of Husband's estate. The Orphans' Court held that Wife was the sole owner of the proceeds, and this Court subsequently affirmed in a published opinion. *In Re Estate of Navarra*, 113 A.3d 829 (Pa. Super. 2015).

**The Present Case**

Wife lacked the capacity to amend her will due to her dementia. Consequently, on October 14, 2014, Clarke filed a petition requesting the Orphans' Court to substitute its judgment for Wife under Section 5536(b) and amend Wife's will to disinherit Husband's legatees. Husband's legatees filed an answer opposing the petition.

On several dates in 2015 and 2016, the Orphans' Court held evidentiary hearings relating to Clarke's petition. In mid-2015, however, Shelledy suffered a stroke, and she died prior to the hearing on February 1, 2016. N.T., 2/1/16, at 3 (testimony that Shelledy had died); *see also* N.T., 2/2/16, at 113-14 (same); Orphans' Court Opinion, 8/25/16, at 1 n.1 ("Shelledy is now deceased"). The record reflects that Shelledy's personal representative has never been substituted as a party in this case.

- 4 -

At the conclusion of the hearings, the Orphans' Court decided to address Clarke's petition in two steps. First, the Orphans' Court would determine whether Section 5536(b) permitted it to grant the relief sought by Clarke: disinheritance of legatees of an incapacitated person. Second, if the statute permitted such relief, the Orphans' Court would determine whether such relief was warranted under the circumstances of this case. On April 29, 2016, the Orphans' Court entered an opinion and order holding that Section 5536(b) permitted courts to disinherit legatees of incapacitated persons. On August 25, 2016, the Orphans' Court entered an opinion and order granting Clarke's petition under Section 5536(b) to substitute the Orphans' Court's judgment in place of Wife. The order directed the amendment of Wife's will to disinherit all of Husband's legatees (including Shelledy) as beneficiaries and bequeath the entire residue of Wife's estate to Clarke and Young in equal shares.

On September 6, 2016, Husband's legatees appealed to this Court. The notice of appeal included Shelledy as an appellant despite her death. Both Appellants and the Orphans' Court complied with Pa.R.A.P. 1925.

In this Court, Husband's legatees argue that (1) the Orphans' Court lacked authority under Section 5536(b) to amend Wife's will to disinherit them; (2) even if Section 5536(b) provided such authority, the Orphans' Court erred by failing to apply the clear and convincing evidence test to Clarke's petition; and (3) Clarke failed to furnish sufficient evidence in support of her petition.

## Jurisdiction

Prior to addressing these issues, we must analyze several jurisdictional issues that arise as a result of Shelledy's death. First, we examine whether Shelledy's death divested the Orphans' Court of subject matter jurisdiction to decide Clarke's action against Shelledy.

Subject matter jurisdiction "relates to the competency of the individual court . . . to determine controversies of the general class to which a particular case belongs." *Green Acres Rehab. & Nursing Ctr. v. Sullivan*, 113 A.3d 1261, 1268 (Pa. Super. 2015) (citation omitted). "[I]t is never too late to attack a judgment or decree for want of jurisdiction. That question is always open." *In re Simpson's Estate*, 98 A. 35, 38 (Pa. 1916). "The want of jurisdiction over the subject matter may be questioned at any time. It may be questioned either in the trial court, before or after judgment, or for the first time in an appellate court, and it is fatal at any stage of the proceedings, even when collaterally involved . . . ." *In re Patterson's Estate*, 19 A.2d 165, 166 (Pa. 1941). Moreover, it is "well settled that a judgment or decree rendered by a court which lacks jurisdiction of the subject matter or of the person is null and void . . . ." *Com. ex rel. Howard v. Howard*, 10 A.2d 779, 781 (Pa. Super. 1939). The question of subject matter jurisdiction may be raised at any time, by any party, or by the court *sua sponte*. *Grimm v. Grimm*, 149 A.3d 77, 82 (Pa. Super. 2016) (citation omitted). Because

jurisdiction is a pure question of law, our standard of review is *de novo*, and our scope of review is plenary. *Id.* (citation omitted).

*Grimm* plays an important role in resolving this issue. The plaintiff in *Grimm* ("Grandson") filed a civil action against his grandfather ("Grandfather") for striking his head with a shovel handle and against two other defendants for facilitating Grandfather's misconduct. Grandfather died during trial court proceedings, and the personal representative of his estate was not substituted in his place as a defendant. In 2011, the trial court sustained the other defendants' preliminary objections and dismissed Grandson's action against them for failure to state a cause of action. In 2013, after Grandfather's death, the trial court entered judgment of *non pros* in favor of Grandfather due to docket inactivity. Grandson thereupon appealed to this Court.

A panel of this Court held that the trial court lacked jurisdiction to enter judgment in favor of Grandfather, because "the death of a party deprives the trial court of subject matter jurisdiction over litigation by or against the deceased until such time as the deceased's personal representative is substituted in his or her place." *Grimm*, 149 A.3d at 80. The panel observed that upon the death of a party, the Rules of Civil Procedure require the filing of a notice of death and the substitution of a personal representative. *Id.* at 84 (citing Pa.R.Civ.P. 2352 and 2355). Moreover, at common law, "a dead man cannot be a party to an action, and any such attempted proceeding is

completely void and of no effect." *Id.* at 84-85 (citing, *inter alia*, **Lange v.**

**Burd**, 800 A.2d 336, 341 (Pa. Super. 2002)). "The language that the courts

of this Commonwealth have used," the panel reasoned,

> leads us to conclude that the death of a party divests a court of
> subject matter jurisdiction over claims brought by or against the
> deceased party. Specifically, this Court and our Supreme Court
> have repeatedly used the terms "null" and "void" when discussing
> the effect of a filing after a party dies. **Eg.**, **Lange**, 800 A.2d at
> 341; **Thompson** [**v. Peck**], 181 A. [597,] 598 [(Pa. 1935)], citing
> **Brooks v. Boston & N. St. R. Co.**, 211 Mass. 277, 97 N.E. 760
> (Mass.1912). An action is only null and void for purposes of
> appellate review if a court lacks subject matter jurisdiction. If a
> party lacks standing, or the court lacks personal jurisdiction or
> power, the issue can be waived and thus *ipso facto* is not null and
> void if not properly preserved. Thus, although these past
> decisions have not explicitly used the term "subject matter
> jurisdiction" when discussing why an action by or against a
> deceased party is null and void, it is evident by the use of the
> terms "null" and "void" that the issue goes to subject matter
> jurisdiction and not to standing, personal jurisdiction, or a court's
> power.

*Id.* at 85. The panel held:

> As the trial court lacked subject matter jurisdiction over
> Grandson's claims against Grandfather at the time it entered the
> judgment of non pros, we vacate the judgment of non pros and
> remand this matter to the trial court to either dismiss the cause
> of action for want of jurisdiction or to permit substitution of a
> personal representative [for Grandfather] in accordance with the
> Pennsylvania Rules of Civil Procedure.

*Id.* at 86.

In this case, Clarke filed a petition requesting the Orphans' Court to

substitute its judgment for Wife and amend Wife's will to disinherit Husband's

legatees. Shelledy, one of Husband's legatees, and one of the respondents to

Clarke's petition, died during the course of litigation, and her personal

- 8 -

representative was not substituted in her place. Pursuant to **Grimm**, the Orphans' Court lost subject matter jurisdiction over the claim against Shelledy at the time of her death, and we lack jurisdiction to rule on this appeal to the extent it relates to Shelledy. **Id.**, 149 A.3d at 85-86. Accordingly, we vacate the Orphans' Court's order as to Shelledy and remand this matter to the Orphans' Court to either dismiss the cause of action for want of jurisdiction or permit substitution of a personal representative for Shelledy.

Next, we examine whether the loss of jurisdiction over the claim against Shelledy deprived the Orphans' Court of jurisdiction over Husband's remaining legatees. Because Shelledy is not an indispensable party, we conclude that the Orphans' Court continued to possess jurisdiction over the remaining legatees.

> In general,
>
> an indispensable party is one whose rights are so connected with the claims of the litigants that no decree can be made without impairing its rights. Appellate courts have consistently held that property owners are indispensable parties in lawsuits concerning the owners' property rights.
>
> The absence of an indispensable party goes absolutely to the court's jurisdiction. If an indispensable party is not joined, a court is without jurisdiction to decide the matter. The absence of an indispensable party renders any order or decree of the court null and void. The issue of "the failure to join an indispensable party" cannot be waived.

**Sabella v. Appalachian Development Corp.**, 103 A.3d 83, 90 (Pa. Super. 2014) (citation omitted). Here, Clarke asked the Orphans' Court to eliminate Husband's legatees' rights to be residuary beneficiaries under Wife's will. Each

residuary beneficiary holds a separate share of the residuary estate. Thus, Shelledy's property right in her share is not "so connected" with the rights of the other legatees in their shares that "no decree can be made without impairing [her] rights." **Id.**

Neither did the loss of jurisdiction over the claim against Shelledy prevent Husband's remaining legatees from appealing the Section 5536(b) order to this Court. Pa.R.A.P. 342, which governs appeals from Orphans' Court, permits an appeal "as of right" of an order "determining the status of . . . beneficiaries . . . in an estate . . ." Pa.R.A.P. 342(a)(5). In contrast to Rule 341(b)(1), which permits an appeal only from a final order that disposes of all claims and all parties, an order is appealable under Rule 342(a)(5) if it determines the status of some, but not all, beneficiaries. **See** Pa. R.A.P. 342, Cmt.; G. Ronald Darlington et al., PENNSYLVANIA APPELLATE PRACTICE §342:1, Volume 20 (2016-2017 ed.). Thus, we exercise jurisdiction over the appeal by Husband's remaining legatees.

### Substantive issues

Husband's legatees first argue that 20 Pa.C.S.A. § 5536(b) did not authorize the Orphans' Court to substitute its judgment for Wife and disinherit residuary legatees in her will. This issue of statutory construction presents a question of law for which our standard of review is *de novo*. **See In re Fiedler**, 132 A.3d 1010, 1018 (Pa. Super. 2016).

We hold that the Orphans' Court construed Section 5536(b) correctly. Although Section 5536(b) does not expressly provide the Orphans' Court with this authority, the legislature intended for courts to construe Section 5536(b) expansively. Viewed in this manner, Section 5536(b) empowers courts to substitute their judgment for incapacitated persons and disinherit their legatees.

Section 5536, entitled "Distributions of Income and Principal During Incapacity," was enacted in 1972 and amended several times thereafter. Section 5536 is part of Chapter 55 of the Probate, Estates and Fiduciaries Code ("PEF Code"), whose purpose is to "protect[] the[] rights" of "incapacitated persons" through "the use of the least restrictive alternative." 20 Pa.C.S.A. § 5502. Chapter 55 defines an "incapacitated person" as "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S.A. § 5501.

Section 5536(b) provides:

**(b) Estate plan.**--The court, upon petition and with notice to all parties in interest and for good cause shown, **shall have the power to substitute its judgment for that of the incapacitated person with respect to the estate and affairs of the incapacitated person for the benefit of the incapacitated person, his family, members of his household, his friends and charities in which he was**

**interested. This power shall include, but is not limited to,** the power to:

(1) Make gifts, outright or in trust.

(2) Convey, release or disclaim his contingent and expectant interests in property, including marital property rights and any right of survivorship incident to joint tenancy or tenancy by the entirety.

(3) Release or disclaim his powers as trustee, personal representative, custodian for minors, or guardian.

(4) Exercise, release or disclaim his powers as donee of a power of appointment.

(5) Enter into contracts.

(6) Create for the benefit of the incapacitated person or others, revocable or irrevocable trusts of his property which may extend beyond his disability or life.

(7) Exercise options of the incapacitated person to purchase or exchange securities or other property.

(8) Exercise all rights and privileges under life insurance policies, annuity contracts or other plans or contractual arrangements providing for payments to the incapacitated person or to others after his death.

(9) Exercise his right to claim or disclaim an elective share in the estate of his deceased spouse and renounce any interest by testate or intestate succession or by *inter vivos* transfer.

(10) Change the incapacitated person's residence or domicile.

(11) Modify by means of codicil or trust amendment, as the case may be, the terms of the incapacitated person's will or of any revocable trust created by the incapacitated person, as the court may deem advisable in light of changes in applicable tax laws.

> In the exercise of its judgment for that of the incapacitated person, the court, first being satisfied that assets exist which are not required for the maintenance, support and well-being of the incapacitated person, may adopt a plan of gifts which results in minimizing current or prospective taxes, or which carries out a lifetime giving pattern. **The court in exercising its judgment shall consider the testamentary and *inter vivos* intentions of the incapacitated person insofar as they can be ascertained.**

*Id.* (emphasis added). The Official Comment to Section 5536(b) states that this section "is consistent with existing case law . . ." Jt. St. Govt. Comm. Comment—1976.

Husband's legatees argue that none of the eleven powers listed in Section 5536(b) expressly authorizes the Orphans' Court to revoke an individual's right of inheritance under a will and, therefore, the Orphans' Court does not have the power under Section 5536(b) to disinherit Husband's legatees.

We reach a different conclusion. Section 5536(b) must be read broadly, and the Orphans' Court's authority is not confined to the enumerated powers in subsection (b)(1)-(11). The first and last sentences of this provision give the Orphans' Court broad power to "substitute its judgment for the incapacitated person" with respect to the "estate and affairs" of the incapacitated person for "the incapacitated person's benefit and members of his household, his friends and charities in which he was interested," taking into account the incapacitated person's "testamentary and *inter vivos* intentions . . . insofar as they can be ascertained." *Id.* To emphasize the

breadth of this power, Section 5536(b) states that "[t]his power shall include, but is not limited to," a wide variety of eleven powers. "Includes, but is not limited to" is a well-known term of enlargement. Our Supreme Court has explained:

> [T]he term 'include' is 'to be dealt with as a word of enlargement and not limitation' . . . this [is] 'especially true' when followed by the phrase 'but not limited to.' . . . [T]he introductory verbiage 'including, but not limited to,' generally reflects the intent of the legislature to broaden the reach of a statute, rather than a purpose to limit the scope of the law to those matters enumerated therein.

*Dechert, LLP v. Commonwealth*, 998 A.2d 575, 580–81 (Pa. 2010).[3] "Any additional matters purportedly falling within the [scope of 'including but not

_____

[3] The **Dechert** opinion collects several decisions illustrating the manner in which courts interpret statutes that have "include, but is not limited to" language:

> In **Pa. Human Relations Comm'n v. Alto–Reste Park Cemetery Ass'n**, [] 306 A.2d 881 ([Pa.] 1973), the appellee cemetery argued that, because nonsectarian cemeteries were not specifically mentioned in the definition of "place of public accommodation," as set forth in the version of the Pennsylvania Human Relations Act in effect at that time, the legislature did not intend for nonsectarian cemeteries to be considered places of public accommodation subject to the jurisdiction of the Pennsylvania Human Relations Commission. In rejecting the cemetery's argument, this Court held that the language of the statute, which defined "place of public accommodation" as "any place which is open to, accepts or solicits the patronage of the general public, including but not limited to [approximately 50 enumerated places of accommodation] but shall not include any accommodations which are in their nature distinctly private," was "broad and all inclusive." [] 306 A.2d at 886 . . . **see also Commonwealth v. Conklin**, [] 897 A.2d 1168, 1176 n. 16 ([Pa.

- 14 -

limted to'], but that are not express, must be similar to those listed by the legislature and of the same general class or nature." ***Department of Environmental Protection v. Cumberland Coal Resources, LP***, 102 A.3d 962, 976 (Pa. 2014).

Additional support for liberal construction of Section 5536(b) comes from the 1976 Official Comment, which observes that this statute "is consistent with existing case law."[4]  At common law, multiple courts invoked the doctrine of substitution of judgment to make estate planning decisions for persons whose incapacity prevented them from acting.  In the leading case on this subject, ***Appeal of Hambleton***, 102 Pa. 50 (1883), a wealthy widower

---

Super.] 2006) (noting that, in the psychology practice act, exceptions set forth following the language "including but not limited to" are illustrative and not exhaustive).  Similarly, in ***Aldine Apartments, Inc. v. Commonwealth***, [] 395 A.2d 299 ([Pa. Cmwlth.] 1978), the Commonwealth Court rejected the petitioner's argument that language contained in Section 7201(m) of the 1971 version of the [Tax Reform] Code, which explicitly included gas and electricity for non-residential use in the definition of tangible personal property, implicitly excluded all gas and electricity for residential use from the definition.  The Commonwealth Court concluded that the language "including, but not limited to" was "a clear indication that the Legislature intended to exclude nothing, implicitly or otherwise, by the language which follows those words." ***Id.*** at 302.

***Id.*** at 581.

[4] Although official comments are not law, we may give them weight in construing statutes because they provide evidence of legislative intent.  ***See Bricklayers of Western Pennsylvania Combined Funds, Inc. v. Scott's Development Co.***, 90 A.3d 682, 692 n.11 (Pa. 2014) (citation omitted).

arranged for his nephew and his nephew's family to live with him and manage his affairs, in return for which the widower provided the nephew a salary. The widower was later declared a "lunatic," and a bank was appointed committee of his estate. The nephew, who continued to live in the widower's household, was appointed committee of his person, and the bank continued to pay the nephew his salary. Upon the audit of the bank account, certain next of kin of the widower persuaded the court to surcharge the nephew for the full amount of the salary paid to him. On appeal, the Supreme Court reversed the lower court and approved the payments, reasoning that the court was duty-bound "to maintain and carry forward the affairs of [the widower] as they were when his mind failed him; to do that which it might reasonably suppose he would have continued to do had he retained his sanity." *Id.*, 102 Pa. at 53.

Following **Hambleton**, courts invoked the substitution of judgment doctrine in other situations where it was necessary to protect the interests of incapacitated persons. **See Brindle's Estate**, 60 A.2d 1, 3 (Pa. 1948) (approving appointment of guardian *ad litem* to contest will disinheriting incapacitated person following determination that guardian exercised undue influence over testator and would not contest the will); **Anderson's Estate**, 40 D. & C. 2d 559, 563 (Chester Co. 1966) (authorizing guardian to exercise incompetent's right to claim principal of life insurance trust of incapacitated person's husband); **Groff's Estate**, 38 D. & C. 2d 556, 566, 569 (Montgomery Co. 1965) (cited in Official Comment to Section 5536(b)) (authorizing

guardian to make *inter vivos* gifts of surplus property to save on death tax); ***Moorehead v. Northumberland County Retirement Board***, 86 D. & C. 283, 287-88 (Northumberland Co. 1953) (permitting guardian to file intention to retire on incompetent's behalf, apply for retirement allowance, and elect manner in which allowance would be paid).

Both the text of Section 5536(b) and the decisions preceding its enactment establish that the legislature intended the statute's list of enumerated powers to be illustrative, not exhaustive. So long as the power in question relates to the incapacitated person's "estate and affairs," ***id.***, and good cause exists to conclude that the exercise of this power will "benefit . . . the incapacitated person, his family, members of his household, his friends [or] charities in which he was interested," ***id.***, the Orphans' Court may exercise it even though it is not explicitly mentioned in subsection (b)(1-11). The power in question here—modification of Wife's will to disinherit several residuary legatees—fits easily within Section 5536(b)'s broad scope, for it concerns an incapacitated person's estate, and its exercise will benefit family members of the incapacitated person by augmenting their residuary shares. Moreover, this power to modify Wife's will is "similar to," and of the "same general class or nature" as, the power in subsection (b)(11) to modify an incapacitated person's will to keep pace with changes in applicable tax laws. ***Cumberland Coal Resources, LP***, 102 A.3d at 976. Accordingly, Husband's legatees' first argument fails.

Husband's legatees' second argument urges us to find that the trial court erred in not requiring that Clarke establish good cause under Section 5536(b) by "clear and convincing evidence" before the trial court could substitute its judgment for Wife, an incapacitated person. The Orphans' Court held that "good cause" required Clarke to demonstrate her right to relief only by a preponderance of the evidence. We review this question of law *de novo*, **Fiedler**, 132 A.3d at 1018, and conclude that the preponderance of the evidence standard is the proper test.[5]

_____

[5] Although the terms "burden of proof" and "standard of proof" are oftentimes used interchangeably, **see Elk Mountain Ski Resort v. WCAB**, 114 A.3d 27 (Pa. Cmwlth. 2015) (the function of a burden of proof or standard of proof is to instruct the factfinder as the level of confidence society believes he should have in the correctness of his conclusion); **In Re Fiori**, 673 A.2d 905, n.9 (Pa. 1996) (the term "clear and convincing evidence" is used more commonly as a burden of proof). In fact, these terms have different meanings.

The "burden of proof" consists of two parts: the burden of production and the burden of persuasion. **Hurley v. Hurley**, 754 A.2d 1283 (Pa. Super. 2000). The "burden of production" tells the court which party must come forward with evidence to support a proposition. **Id.** The "burden of persuasion" determines which party must produce sufficient evidence to convince a judge that a fact has been established. **Id.** A "standard of proof" on the other hand refers to the degree or level of proof demanded in a specific case. Black's Law Dictionary (Seventh Edition 1999). A standard of proof instructs a factfinder as to the level of confidence society believes a litigant should have in the correctness of a conclusion, such as proof "beyond a reasonable doubt," by a "preponderance of the evidence," or by "clear and convincing evidence." **See Commonwealth v. Maldonado**, 838 A.2d 710, 715 (Pa. 2003). Different standards of proof reflect differences in how society believes the risk of error should be distributed as between the litigants. **Id.** In the present case, while the parties often refer to this second issue as respecting the proper "burden" of proof, in reality, the issue more accurately concerns the proper standard of proof, or that quantum of proof necessary to establish by a preponderance of

A preponderance of the evidence is "the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." *Raker v. Raker*, 847 A.2d 720, 724 (Pa. Super. 2004). The preponderance test is the normal burden of proof in most civil proceedings. *See Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 408 (Pa. 2014) (citations omitted). Indeed, the term "burden of proof," standing alone, implicitly means "by the preponderance of the evidence." *Se-Ling Hosiery v. Margulies*, 70 A.2d 854, 856-57 (Pa. 1950).[6]

_____

the evidence that good cause was established for the Orphans' Court to substitute its judgment for Wife.

[6] The *Se-Ling* Court stated:

In the quotation from Lord Justice Bowen in our opinion in the case of *Arco Metalscraft Company v. Shaw et al.*, 70 A.2d 850 this day filed, in which Baron Bowen lays down a rule about the shifting of the burden of proof in the course of a trial, it is pertinent to observe that this experienced English judge, like Wigmore and Thayer, used the phrase: 'onus of proof', or 'burden' without adding, 'by the fair preponderance of the evidence'. These legal scholars recognized the fact that in civil cases the phrase 'burden of proof' when unqualified by any additional phrase implies 'by the fair preponderance of the evidence'. If a trial judge in a civil case instructs the jury that plaintiff 'has the burden of proof' the defendant has no cause for complaint, because of what is implicit in that phrase when it stands alone. However, a plaintiff would have grounds for complaint because if the jury was not instructed that 'burden of proof' in a civil case meant only 'by the fair preponderance of the evidence' the members of the jury might have the idea that the phrase 'burden of proof' meant some higher degree of proof than mere preponderating evidence. Therefore, the omission of the phrase 'by the fair preponderance of the evidence' in the judge's charge in the instant case was something

- 19 -

The clear and convincing evidence standard is stricter than the preponderance standard. It is the "highest standard of proof utilized in civil proceedings, requiring evidence that is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts [in] issue." *In Re Vencil*, 152 A.3d 235, 237 n.1 (Pa. 2017).

In our view, the legislature in enacting 5536(b) intended "good cause" to require a preponderance of the evidence instead of clear and convincing evidence. Generally, when the legislature determines that clear and convincing evidence should be the standard of proof, it has said so, as evidenced in multiple PEF Code statutes. *See*, 20 Pa.C.S.A. § 5501(a) ("the

_____

of which the plaintiff could have justly complained, but of which the defendant could not justly complain. Plaintiff having secured the verdict makes no complaint.

In the instant case the court below said: 'We are convinced that the verdict for the plaintiff was not: 1-against the law; 2-against the evidence, and 3-against the weight of the evidence.' The record sustains the view that the plaintiff successfully carried its burden of proof. That the jury believed plaintiff had done so is indicated by the verdict. We think it would be unfair to take away the verdict plaintiff secured merely because the trial judge in his charge as to plaintiff's burden of proof omitted the phrase 'by the fair preponderance of the evidence'. This slight departure from the formula customarily used in charging a jury in a civil case does not amount to reversible error, though the safest course for a judge in charging the jury in such cases would be to adhere to the long established formula and say that the plaintiff has the burden of proving his claim by the fair preponderance of the evidence.

*Id.*, 70 A.2d at 856-57.

court, upon petition and hearing and upon the presentation of clear and convincing evidence, may find a person domiciled in the Commonwealth to be incapacitated and appoint a guardian or guardians of his person or estate"); 20 Pa.C.S.A. § 305(b) ("[a]bsent an allegation of enduring estrangement, incompetence, contrary intent or waiver and agreement which is proven by clear and convincing evidence, a surviving spouse shall have the sole authority in all matters pertaining to the disposition of the remains of the decedent"); 20 Pa.C.S.A. § 6303(a) ("[a] joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sum on deposit, unless there is clear and convincing evidence of a different intent"); 20 Pa.C.S.A. § 6304(a) ("[a]ny sum remaining on deposit at the death of a party to a joint account belongs to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent at the time the account is created"); 20 Pa.C.S.A. § 7740.5 ("[t]he court may reform a trust instrument, even if unambiguous, to conform to the settlor's probable intention if it is proved by clear and convincing evidence that the settlor's intent as expressed in the trust instrument was affected by a mistake of fact or law, whether in expression or inducement"). Thus, the absence of "clear and convincing" language from Section 5536(b) provides strong evidence that the legislature did not intend to vary the presumed standard of proof of a preponderance of the evidence for a civil case, when it directed that petitioners must demonstrate "good

- 21 -

cause" for a court to substitute its judgment for that of an incapacitated person under Section 5536(b).

We further are guided by the principle of statutory construction that the objective of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. 1 Pa. C.S.A. §1921. Our review of the PEF Code reveals that the legislature has reserved the clear and convincing standard for exceptional circumstances—for example, when petitioners attempt to take away rights held by incapacitated persons, **see**, **e.g.,** 20 Pa.C.S.A. § 5511 (clear and convincing evidence required to declare person incapacitated), or when the petitioner moves to reform a trust instrument on the ground that it was affected by a mistake of fact or law (discussed in n.7, **infra**). But when the statute's purpose is to benefit incapacitated individuals, the more liberal preponderance standard controls, consistent with Chapter 55's goal of "protecting [the] rights" of "incapacitated persons" through "the use of the least restrictive alternative." 20 Pa.C.S.A. § 5502. Since Section 5536(b)'s express purpose is to benefit incapacitated persons (as well as his family, members of his household, his friends and charities), we conclude that the standard of proof by a preponderance of the evidence applies to this provision.

To illustrate, we contrast the standards governing petitions to declare a person incapacitated (a procedure to take away an incapacitated person's rights) with the standards governing petitions to declare that a person has

regained competency (a procedure that benefits incapacitated persons). At common law, courts required clear and convincing evidence to declare a person incapacitated. *Matter of Caine*, 415 A.2d 13, 15 & n.4 (Pa. 1980). The standard remains the same under the PEF Code. *See* 20 Pa.C.S.A § 5511(a). On the other hand, under two different statutory schemes, when a petitioner who previously was held incapacitated seeks a declaration of regained competency, courts have required her to prove her case only by a preponderance of the evidence. The first statutory scheme, 50 P.S. § 3323, which was in effect until 1992, required the petitioner to show "good cause"— the same element in Section 5536(b)—that she regained her capacity. The petitioner could satisfy the "good cause" element by a preponderance of the evidence. *In Re Nagle's Estate*, 210 A.2d 262, 264 (Pa. 1965). In 1974, the legislature re-enacted Section 3323 as 20 Pa.C.S.A. § 5517. In 1975, our Supreme Court held that "good cause" under Section 5517 continued to require a preponderance of the evidence. *See In Re Porter's Estate*, 345 A.2d 171, 174 (Pa. 1975) (citing *Nagle*). The second statutory scheme was created in 1992. The legislature removed the "good cause" element from Section 5517 and required a hearing under a new statute, 20 Pa.C.S.A. § 5512.2, when the incapacitated person sought a declaration of regained capacity. The only evidentiary standard mentioned in Section 5512.2 was in subsection (b): "Except when the hearing is held to appoint a successor guardian, the burden of proof, by clear and convincing evidence, shall be on

the party advocating continuation of guardianship or expansion of areas of incapacity." 20 Pa.C.S.A. § 5512.2(b). Thirteen years after this second statutory scheme came into existence, we held that the burden of proof in incapacity proceedings remained the same as under the first scheme: "[W]hile the initial burden of proving incapacity is a clear and convincing standard . . . the incapacitated person has the burden of establishing that he has regained capacity only by a fair preponderance of the evidence."[7] *In Re Estate of Rosengarten*, 871 A.2d 1249, 1255 (Pa. Super. 2005) (citing *Porter*).

---

[7] Before leaving this subject, we address another exceptional circumstance in which the legislature has required clear and convincing evidence: when a petitioner moves to reform a trust instrument to conform to the settlor's intent when the trust instrument "was affected by a mistake of fact or law . . ." 20 Pa.C.S.A. § 7740.5. The clear and convincing standard applies here not only "to guard against the possibility of unreliable or contrived evidence," Uniform Law Comment, 20 Pa.C.S. § 7740.5, but also because Pennsylvania traditionally has required clear and convincing evidence to reform instruments on the basis of mistake. *See Thrasher v. Rothrock*, 105 A.2d 600, 604 (Pa. 1954) (citing *In re Ridgway's Account* 56 A. 25 (Pa. 1903)).

The circumstances addressed in Section 7740.5 do not exist here. Clarke does not contend that Wife's will was the product of mistake at the time of execution. Instead, Clarke contends that the will was consistent with Wife's intent at the time of execution, but that (1) Wife and Husband had reciprocal wills, (2) Husband later amended his will to disinherit Wife's children, so (3) as a matter of reciprocity, Wife would have responded to Husband's amendment by amending her own will to disinherit Husband's legatees. Thus, Section 7740.5 would not persuade us that the clear and convincing test applies to the present case.

Two lessons emerge from this history. The fact that the preponderance standard governed both statutory schemes when a declaration was sought to regain competency demonstrates the legislature's intent for a more liberal standard to apply when the statute's purpose is to benefit incapacitated persons. In addition, the fact that the "good cause" element under the pre-1992 statutory scheme was satisfied by a preponderance of the evidence, **see** **Nagle** and **Porter**, **supra**, indicates that the "good cause" element in Section 5536(b) is satisfied by the preponderance of the evidence as well.

For these reasons, Husband's legatees' second argument must fail.

In their third and final argument, Husband's legatees contend that the evidence did not support the Orphans' Court's decision to substitute its judgment for Wife and disinherit Husband's legatees. Husband's legatees contend that Husband disinherited Wife and her children not because of any animus towards them, but to protect his estate from the high costs of Wife's long-term care facility and to ensure that his legatees received their residuary shares of his estate. A reasonable person in Wife's position, Husband's legatees claimed, would have "appreciated and understood the need for [Husband] to delete her as beneficiary of his probate assets and owner by right of survivorship of jointly held assets passing on his death." Brief For Appellants at 26.

When reviewing an Orphans' Court's decree, we must determine whether the record is free from legal error and the evidence supports the

Orphans' Court's factual findings. ***In Re Estate of Fuller***, 87 A.3d 330, 333

(Pa. Super. 2014) (citation omitted).

Here, the Orphans' Court reasoned as follows:

[I]t is significant to the Court that the testamentary act of disinheriting an institutionalized spouse is a recognized estate planning tool. In this case, it was reasonable for [Husband] to disinherit [Wife] for purposes of estate planning because she was a resident of a long term care facility. As such, the Court finds no fault in the revision of [Husband]'s Will on December 31, 2009 disinheriting [Wife]. However, not only did [Husband] disinherit [Wife] as his spouse in this Will, he also removed her two natural children as heirs.

It could be safely concluded that the reason [Clarke] was removed by [Husband] is because [Husband] simply did not like her based largely on his perception that she had [Wife] taken from the home [Husband] and [Wife] shared without consultation with [Husband] or his approval. Moreover, the record reflects that [Husband] was very upset at [Clarke] interfering with his personal affairs. However, while [Husband] may greatly resent [Clarke]'s conduct, there is insufficient evidence of record to determine the reason Brent Young was removed as a residuary heir. As such, the Court concludes [Wife]'s natural children were removed by [Husband] from his Will at least in part for the purposes of benefiting [Husband]'s children in that they were left the entirety of his estate.

Should [Husband] simply have disinherited [Wife], but left the residuary beneficiaries the same as those listed in the initial Will, the ultimate distribution of [Husband's] and [Wife]'s assets would have been in accordance with the alleged agreement they had with each other consistent with the 2007 Wills. However, [Husband] disinherited [Wife] and both of [Wife]'s natural children while [Wife] was still living. It must be considered that after [Husband] passed, [Husband's legatees] should have received a certain inheritance, comprised of probate and/or non-probate assets pursuant to [Husband]'s 2009 Will. It is logical that since [Husband's legatees] have already received an inheritance to the exclusion of [Wife]'s natural children, [Wife] could logically disinherit [Husband's legatees] from her will as a response,

- 26 -

thereby leaving the entirety of her estate to her two biological children.

Orphans' Ct. Op. at 13-14. Substitution of judgment and disinheritance of Husband's legatees, the Orphans' Court said, was permissible because a reasonable person would conclude that Wife would have disinherited Husband's legatees.

We agree with this reasoning. The evidence supports the Orphans' Court's factual finding that Husband disinherited Wife's children at least in part due to anger at Clarke for removing Wife from the marital residence. Under these circumstances, a reasonable person would conclude that Wife would have reacted to her children's disinheritance by removing Husband's legatees from her own will. Additional support for this conclusion comes from record evidence that (1) during Husband's lifetime, his children caused the transfer of assets jointly owned by Husband and Wife to themselves, and (2) Husband's children mistreated Wife while she lived at the marital residence by denying caregiver visits and isolating her from Husband. We hold that the Orphans' Court correctly ruled that good cause existed to substitute its judgment and remove Husband's legatees as legatees under Wife's will.

Order vacated as to Charlene Shelledy and remanded for further proceedings in accordance with this opinion. Order affirmed in all other respects. Jurisdiction relinquished.

President Judge Emeritus Ford Elliott joins this opinion.

Judge Strassburger files a dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  4/11/2018