J-S22018-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: DAVID ITALIANO, AN       :    IN THE SUPERIOR COURT OF
ALLEGED INCAPACITATED PERSON   :       PENNSYLVANIA
                                        :
                                        :
                                        :
                                        :
                                        :
                                        :    No. 202 MDA 2021

Appeal from the Order Entered January 19, 2021
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s): 2019-177

BEFORE:     PANELLA, P.J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:        **FILED: NOVEMBER 1, 2021**

David Italiano (Appellant) takes this counseled appeal from the order entered in the Huntingdon County Court of Common Pleas, Orphans' Court, adjudicating him totally incapacitated under the Probate, Estates and Fiduciaries Code.[1] Appellant argues the orphans' court erred in: (1) finding the evidence supported incapacitation; and (2) failing to adequately explain the nature of his disability and the type of guardianship that would be appropriate. After careful review, we affirm.

This matter commenced on August 16, 2019, with a petition, filed by the Huntingdon-Bedford-Fulton Area Agency on Aging (the Agency), to have Appellant adjudicated incapacitated. At that time, Appellant was 70 years old

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] *See* 20 Pa.C.S. §§ 5501-5555 (Chapter 55, "Incapacitated Persons").

and suffered from "physical and mental conditions," such as depression, "[h]ypertension, coronary artery disease, high cholesterol, arthritis, restless leg, gastroesophageal reflux[,] aortostenosis[, n]europathy and a low back pain." Agency's Petition to Adjudicate Incapacity & to Appoint Emergency and/or Permanent Guardian of the Person & Estate, 8/16/19, at 1; N.T., 1/12/21, at 5. The Agency alleged he was not capable of caring for himself. It was also alleged that Appellant was being abused by his wife; her actions "include[ed] jumping on . . . his back, and causing back injury, putting him in women's clothing while she has designer purses and things, [and] not feeding him. [Appellant] would have to get someone to take him to the food bank to get food." N.T., 1/12/21, at 21. Appellant's wife also "[stole] Oxycodone from him," for which she subsequently pleaded guilty. *Id.*

On the same day the petition was filed, August 16, 2019, the orphans' court appointed the Agency as emergency guardian of Appellant's person and estate, and appointed Ray Ghaner, Esquire (Appellant's Counsel) to represent Appellant. On October 28th, the court entered a decree adjudicating Appellant a totally incapacitated person and appointing as permanent guardian of his **person** Susquehanna Guardians and Advisors, Inc. (Susquehanna).[2] Meanwhile, Appellant was placed in a 24-hour skilled nursing facility in

---

[2] At this time, the orphans' court did not appoint any guardian of Appellant's estate. *See* Final Decree, 10/28/19, at 1-2.

"Loyalsock in the Williamsport area over an hour and a half away . . . to keep him away from his wife." N.T., 1/12/21, at 21. Appellant "was even given a different name to refer to[,] instead of his own," and was essentially "hidden from her so she could not continue the pattern of abuse[.]" *Id.* at 22.

Ten months after the adjudication decree, on August 27, 2020, Susquehanna, as guardian of Appellant's person, filed a letter with the orphans' court, suggesting review of the guardianship order.[3] Susquehanna informed the court that Appellant's wife died that month, the couple owned real property and automobiles, and the appointment of a guardian of his **estate** may be necessary. Susquehanna further stated, however, that: the staff at Appellant's nursing facility advised that Appellant "does not need nursing home care, but rather . . . could safely reside in a less restrictive environment like a personal care home[;]" Appellant "is competent and does not need a guardian to make personal and health care decisions for him[;]"Appellant agreed with the above. Susquehanna's Letter, 8/27/20, at 1. Susquehanna attached to its letter two evaluations by psychologist Frank Tulak, PsyD. One report concluded: "None of the standardized tests completed by [Appellant] on May 18, 2020 indicate any cognitive impairment."

---

[3] While this letter appears in the certified record on appeal, it was not entered on the trial court's docket.

Susquehanna's Letter, 8/27/20, Exh. Progress Notes of Frank Edward Tulak, PsyD., 5/21/20, at 2.

The orphans' court conducted a hearing on November 10, 2020. Susquehanna's president, James Malee, summarized the issues before the court to be: whether Appellant should continue to be adjudicated incapacitated; and if so, whether Susquehanna should continue to serve as guardian of his person. *See* N.T., 11/10/20, at 2, 4. Susquehanna suggested that "after the death of [Appellant's] wife[,] it might be desirable [for him] to relocate back to his hometown area," which would be two hours away from Susquehanna's office. *Id.* at 4. Appellant's counsel argued "that none of the standardized testing [performed by Dr. Tulak on Appellant] showed any impairment[,]" and thus Appellant did not need a guardian and could move to "independent living." *Id.* at 7-8. At the conclusion of this proceeding, the orphans' court removed Susquehanna as guardian of Appellant's person, but appointed the Agency as emergency guardian of his person and estate. *Id.* at 9-10. The court also directed the Agency to investigate Appellant's need for a guardianship. *Id.* at 10.

The orphans' court then conducted an evidentiary hearing on January 12, 2021.[4] As Appellant's issue on appeal goes to the evidence supporting

---

[4] This hearing was conducted via video conferencing due to the COVID 19 judicial emergency. N.T., 1/12/21, at 1.

the orphans' court decision, we review it in detail. The agency presented a report by Dr. Steven Henricks, the psychiatrist at Appellant's nursing facility. The report summarized:

> [Appellant's] thoughts are coherent and intermittently rational. He does have a lot of tangentiality and disorganized thought processes with excessive, irrelevant rambling apparent. . . .
>
> [Appellant's] insight however appears limited and his judgment mixed. **He does appear to be someone who could easily be quite vulnerable to be taken advantage of.** It is ironic that he seems to want to be trusting of the people who may have abused or taken advantage of him, yet quite paranoid about those who are tasked with caring for him.
>
> My assessment is that [Appellant] has at least schizoid and schizotypal personality traits, but may have disorganized schizophrenia. He is not on any psychotropic medications and functions fairly well on a day-to-day basis. . . . I agree with [Dr. Rosemary Wiegand] that [Appellant] could function with more independence at something like a personal care home or assisted living. Perhaps he could go onto completely independent living eventually but it would be good to see he can function adequately and safely with more liberty than what is available to him here. . . .

N.T., 1/12/21, at 23, Agency Exh. 1, Report of Steven R. Hendricks, D.O., 11/4/20, at 3 (paragraph break and emphasis added).

The Agency also called Dr. Rosemary Wiegand, a physician and the medical director of Appellant's skilled nursing facility. *See* N.T., 1/12/21, at 5. She testified to the following: Despite Dr. Hendricks' opinion that Appellant has schizotypal personality or disorganized schizophrenia, Appellant possibly has neither, but instead "more of a personality trait." *Id.* at 5, 10. In any event, upon a question from the orphans' court, Dr. Wiegand agreed that it is

this "condition, whether it's disorganized schizophrenia or a personality disorder . . . could be significantly detrimental to him[.]" *Id.* at 11. In the past, Appellant was diagnosed with depression, but he refused to take medication. *Id.* at 6. Dr. Wiegand testified as to Appellant's need for supervision:

> [Appellant is] very impressionable and he can be led astray very easily. He makes poor decisions frequently as far as taking his medications, [and] what his belief of what needs to be done for his health. So without some type of supervision on some level, I think he could very easily not take his medications and end up not being able to provide for himself and may possible be left on the street.

*Id.* at 6. Dr. Wiegand "very much" believed that Appellant could "be the victim of designing persons[.]" *Id.* at 7.

However, Dr. Wiegand agreed Appellant did not require a skilled nursing facility, as he is "totally functional with taking care of activities of daily living." N.T., 1/12/21, at 8. A "personal care or [an] assisted living home would be more appropriate for" him. *Id.* Nevertheless, Appellant needed oversight of his finances and "someone to just help him with his decisions at times[,]" for example, to eat regularly, take his medications, follow up with doctors, and to ensure he is not "easily led astray" by other people who "tell him [when] things aren't completely true or that are not in his best interests[.]" *Id.*

The Agency next called its protective services worker, Mary Beth Swan, who testified to the following. Appellant receives "Medicaid with nursing home benefits through the Commonwealth," and "[w]hen he was in the

community[,]" he received Social Security income of approximately $1,000 monthly. N.T., 1/12/21, at 15. As emergency guardian, the Agency arranged for new locks at Appellant's home and winterized the home.[5] *Id.* at 13-14. More recently, however, the water was shut off, there may be broken pipes, and someone "living in the home without permission [had] removed all the appliances." *Id.* at 15. There are two vehicles at the property. *Id.* at 14. Ms. Swan compiled the bills for the home, in both his and his deceased wife's names, and "call[ed] to undo any ongoing charges, penalties and fees [and] reduce [future] costs." *Id.* The Agency reviewed two years of Appellant's bank statements and observed "problems of financial management," including "a lot of overdrafts[ and] spending on things that weren't bills[.]" *Id.* at 20.

Ms. Swan agreed, however, that Appellant could live "in a less restrictive setting." N.T., 1/12/21, at 19. She and Appellant had "a very long" meeting with a domiciliary care home, but Appellant declined to move there. *Id.* at 14. The Agency was "prepared to get a level of care assessment for [Appellant] and to discuss with him the . . . options that [are] the least restrictive settings and determine the amount of care he will need[.]" *Id.* at 15. With respect to his wife's abuse, Ms. Swan testified that Appellant both

---

[5] The Agency was previously "involved in the home," prior to Appellant's 2019 adjudication of incapacity, when Appellant lived in the home with nine cats and "there were concerns . . . of cat urine[ and] feces[ and] a very strong odor of ammonia in the home[.]" N.T., 1/12/21, at 16.

"recanted the abuse[,] requesting to move back to be with her, and "reiterated the abuse[.]" N.T., 1/12/21, at 22.

Appellant also testified. He wished to live in his own apartment and "have the ability to secure help when [he] needed it[.]" N.T., 1/12/21, at 26. He desired ultimately to return to his home "when it's appropriate[,]" as he understood it was in a significant state of disrepair. *Id.* at 27, 28. When he previously lived at his home, he was within walking distance of his doctor at Southern Huntingdon Medical Center, and for food, he drove "to Lewistown to get bargains at Ollie's and . . . ask[ed] for help at the Orbisonia food bank[.]" *Id.* at 27. When asked whether he understood the allegations that he could be subjected to "designing persons," Appellant replied as follows:

> [Appellant:] Oh, yes. I have lived for a long time and it's always been that way. I lived a lot of rough places.
>
> [Appellant's Counsel:] Do you believe that people can take advantage of you? Do you believe what people tell you without verifying it?
>
> A. Yes, I think it gets to be humorous. I laugh in their face.

*Id.* at 28.

Appellant also presented the report of Dr. Tulak, which was previously attached to Susquehanna's letter requesting review of Appellant's guardianship order. Appellant's Counsel argued that while "[t]his is a tough case[,]" the evidence did not establish "the legal definition of an incapacitated person" — that Appellant could not receive and evaluate information effectively or he was impaired such that he was unable to care for himself.

N.T., 1/12/21, at 31-32. The Agency responded that Appellant was "in a much better condition today . . . because of the care that's been provided to him in a secure setting." *Id.* at 32-33. The Agency argued the great concern was Appellant's becoming a victim of designing persons, and that if the orphans' court allowed him to live independently, "it's only going to be a short matter of time before someone gets [their] hands on [Appellant] and things go poorly." *Id.* at 33.

One week after the hearing, on January 19, 2021, the orphans' court issued the underlying order, adjudicating Appellant a totally incapacitated person. The order also appointed the Agency as the guardian of Appellant's person and estate. The court noted "this is a very difficult case, because based on the facts, it is a close call as to whether Appellant remains incapacitated." Orphans' Ct. Op., 4/12/21, at 3. Nevertheless, the court credited Dr. Wiegand's testimony that Appellant is "very impressionable and . . . can be led astray very easily," and that "it is [Appellant's] need for . . . support that renders him incapacitated." *Id.*

Appellant filed a timely notice of appeal and complied with the orphans' court order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

Appellant presents the following issue for our review:

Whether the Trial Court erred in its decision finding [Appellant] a totally incapacitated person and thus appointing a plenary guardian, when the record of the January 12, 2021 hearing does not support the Court's legal conclusions?

Appellant's Brief at 2.

Appellant presents two arguments in claiming the orphans' court erred in adjudicating him to be a totally incapacitated person, which we address *seriatim*. First, Appellant avers the evidence did not establish incapacity. He cites, *inter alia*: (1) Dr. Wiegand's testimony that although he "is impressionable and may make poor decisions, he is nevertheless totally functional in taking care of his 'activities of daily living[;]'" (2) Dr. Hendricks' report, which stated Appellant could live more independently at a personal care home or assisted living facility; (3) Dr. Tulak's report that "none of the standardized tests . . . show any impairment[;]" and (4) Appellant's own testimony about "his current living situation," his desire to live in an apartment and "how he would receive medical care and . . . obtain food," and the fact that he has "never been placed in a facility for any conditions." Appellant's Brief at 6-9. Appellant suggests that a **limited** guardian may be appropriate, but "based on the medical evidence, [he] does not meet the threshold of someone who is incapacitated and in need of a Guardian of his Person and Estate." ***Id.*** at 10. We conclude no relief is due.

We first consider the standard of review and relevant authority:

> Our scope of review in determining whether an individual should be adjudicated incompetent and have a guardian of his estate appointed is well established. The trial court has the sound discretion to determine whether the appointment of a guardian is necessary and this [C]ourt will not reverse absent an abuse of that discretion. "We do not substitute our judgment for that of the

court below; even though we, had we been sitting in judgment below, might have reached a contrary result."

***Smith v. Smith***, 529 A.2d 466, 468 (Pa. Super. 1987) (citations omitted).

"'The credibility of the witnesses and the weight to be given their testimony is in the first instance to be determined by the auditing judge. His [or her] findings of fact, affirmed by the court *en banc*, like those of a jury, are conclusive unless they are unsupportable by the record.'"

***In re Estate of Duran***, 692 A.2d 176, 178 (Pa. Super. 1997) (citations omitted).

Chapter 55 of our Probate, Estates and Fiduciaries Code governs incapacitated persons. Section 5501 defines an "incapacitated person" as "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S. § 5501. The stated purpose of the Code is, *inter alia*, to

establish[ ] a system which permits incapacitated persons to participate as fully as possible in all decisions which affect them, which assists these persons in meeting the essential requirements for their physical health and safety, protecting their rights, managing their financial resources and developing or regaining their abilities to the maximum extent possible and which accomplishes these objectives through the use of the least restrictive alternative[.]

20 Pa.C.S. § 5502.

An incapacitated person, guardian or any interested party may "petition[ ] the court for a hearing for reason of a significant change in the

person's capacity[ or] a change in the need for guardianship services." 20 Pa.C.S. § 5512.2(a). While the party seeking an initial adjudication of incapacity bears the burden of proving incapacity under a clear and convincing standard, an incapacitated person "has the burden of establishing that he has regained capacity . . . by a fair preponderance of the evidence." *In re Navarra*, 185 A.3d 342, 356 (Pa. Super. 2018) (citation and footnote omitted). "[I]t is certainly possible that an [incapacitated person] may be unable to manage his estate and, yet, be capable of making reasonable choices concerning his personal life." *Berry v. Berry*, 197 A.3d 788, 798 (Pa. Super. 2018) (citation omitted).

We construe Appellant's arguments to be a challenge to the weight of the evidence supporting the finding of incapacity. As stated above, the court found "this is a very difficult case" and "a close call as to whether Appellant remains incapacitated." Orphans' Ct. Op. at 3. Here, the orphans' court considered all of the evidence that Appellant now relies upon on appeal — that he is capable of performing daily life activities and does not require a skilled nursing facility. However, we emphasize, the court thoughtfully reviewed this evidence against the testimony and reports that Appellant was also impressionable and could easily be victimized by designing persons. *See id.* at 3-4 (citing Dr. Wiegand's testimony that Appellant is "very impressionable and . . . can be led astray very easily" and Dr. Hendrick's report that Appellant's insight "appears limited and his judgment mixed[,]" and he

"appear[s] to be someone who could easily be quite vulnerable to be taken advantage of").

The court observed, as the Agency acknowledged, that Appellant, now 72 years old, "has made substantial progress in regard to both his physical and medical condition since the initial [October 2019] decree finding incapacity[,] and there is substantial evidence showing that, **with appropriate support**, he can live very independently." Orphans' Ct. Op. at 3 (emphasis added); *see also* N.T., 1/12/21, at 32. The court then concluded "it is the need for such support that renders [Appellant] incapacitated." Orphans' Ct. Op. at 3.

> [I]t is clear that Appellant's significant improvement in terms of independence is due to the support and guidance he has received, and that such guidance and support will need to continue in order for him to maintain that level of independence. All of the people involved in his care who testified at the review hearing (or provided reports regarding such care . . . ) agreed that without a plenary guardian[,] Appellant is highly likely to be taken advantage of and to wind up homeless.
>
> [W]hile he is blameless for being victimized by his wife, the extended period of abuse that Appellant suffered at her hands, and his later [recantation of the abuse] show that [he] is at high risk for being victimized by other parties in the future. . . .

*Id.* at 4-5 (paragraph break added and footnote omitted).

We conclude the orphans' court did not abuse its discretion in weighing the evidence, which we note was generally not disputed. *See Smith*, 529 A.2d at 468. We defer to the court's findings of credibility and the weight to be given the testimony and reports. *See Estate of Duran*, 692 A.2d at 178.

- 13 -

We also consider Drs. Wiegand and Hendrick and Ms. Swan's unanimous agreement that Appellant should be moved to a less restrictive setting, and the Agency's desire to "get a level of care assessment for [Appellant] and to discuss with him the . . . least restrictive settings and the . . . amount of care he will need[.]" *See* N.T., 1/12/21, at 7, 15, 19.  This is consistent with the Code's purpose of accomplishing its "objectives through the use of the least restrictive alternative[.]" *See* 20 Pa.C.S. § 5502.

Next, Appellant avers the orphans' court failed to "adequately explain the nature and condition of [his] disability which impairs his ability to make and communicate decisions[,]" or to "indicate the extent of [his] capacity to make and communicate decisions[,]" as required by Section 5512.1 of the Probates, Estates and Fiduciaries Code.  Appellant's Brief at 11.  Appellant also contends the court failed to "detail[ ]" his need for guardianship or "adequately explain the type of guardianship that would be appropriate for him." *Id.*  We disagree.

Section 5512.1(a) provides:

> . . . In all cases, the court shall consider and make specific findings of fact concerning:
>
>> (1) The nature of any condition or disability which impairs the individual's capacity to make and communicate decisions.
>>
>> (2) The extent of the individual's capacity to make and communicate decisions.
>>
>> (3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in

light of the existence, if any, of advance directives such as durable powers of attorney or trusts.

(4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.

(5) The duration of the guardianship.

(6) The court shall prefer limited guardianship.

20 Pa.C.S. § 5512.1(a)(1)-(6).

We disagree with Appellant's summation that the orphans' court failed to adequately set forth analysis of the above factors. At the hearing, the court asked Dr. Wiegand that regardless of whether Appellant suffered from disorganized schizophrenia or merely a personality disorder, would the underlying conduct or condition "be significantly detrimental to him." N.T., 1/12/21, at 11. Dr. Wiegand replied in the affirmative. *Id.* Additionally, we incorporate our above discussion of the court's opinion, and conclude the court clearly stated its findings with respect to the bases for Appellant's incapacity and his need for supervision or guidance. *See* Orphans' Ct. Op. at 3-5.

For the foregoing reasons, we affirm the January 19, 2021, order of the orphans' court adjudicating Appellant to be a totally incapacitated person and appointing the Agency as guardian of his person and estate.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/01/2021